# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Mark Filip | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 7849 | **DATE** | 5/6/2004 |
| **CASE TITLE** | KAREN R. COUGHLIN vs. WRIGLEY MANUFACTURING COMPANY, LLC | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due _____. Reply to answer brief due _____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   ENTER MEMORANDUM OPINION GRANTING DEFENDANT WRIGLEY MANUFACTURING COMPANY, LLC'S MOTION FOR SUMMARY JUDGMENT.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | MAY 07 2004 | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | | 25 |
| ✓ | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| TBK | courtroom deputy's initials | | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

KAREN R. COUGHLIN,                    )
                                      )
                   Plaintiff,         )        Case No. 02 C 7849
                                      )
        v.                            )        Judge Mark Filip
                                      )
WRIGLEY MANUFACTURING                 )
COMPANY, LLC.,                        )
                                      )
                   Defendants.        )

DOCKETED

MAY 07 2004



## MEMORANDUM OPINION GRANTING DEFENDANT WRIGLEY MANUFACTURING COMPANY, LLC'S MOTION FOR SUMMARY JUDGMENT

Plaintiff has sued her employer, Defendant Wrigley Manufacturing Company, LLC

("Defendant" or "Wrigley"), under Title VII of the Civil Rights Act of 1964, as amended, 42

U.S.C. § 2000e, *et seq.* ("Title VII"), alleging that she was subjected to a gender-based hostile

work environment. Defendant has moved for summary judgment. For the reasons stated below,

Defendant's motion is granted.

### RELEVANT FACTS

Defendant is in the business of manufacturing chewing gum.[1]  Plaintiff is a woman in her

early thirties who began work at Defendant's Chicago plant in 1990. Plaintiff started out as a

"helper" and then became an operator of gum wrapping machines. Plaintiff's grandmother

worked at the plant years ago and Plaintiff's former husband worked there for ten years.

---

[1]Plaintiff has admitted without qualification most of the facts set forth in Defendant's
Local Rule 56.1 (3) statement ("Defendant's Statement") (D.E. 16). For the sake of simplicity,
except as otherwise indicated, the facts included herein have been taken from Defendant's
Statement, though citations to that statement have been omitted.

25

Plaintiff's uncle and current husband work at Wrigley's Chicago plant. Plaintiff's mother, a supervisor at the Wrigley plant, has worked there for thirty-three years. As explained, Plaintiff began at the Wrigley plant in 1990, and she does not allege any harassing acts occurred during her first ten years of employment there.

The first incident at Wrigley about which Plaintiff complains took place in July or August of 2000, when she returned to work after being on maternity leave for the birth of her third child. (*See* D.E. 20 at 9; *see also id.* at Ex A, 34-35, 37.) Her coworker, Tom Carey, related that other employees had been saying that Mr. Carey, rather that Plaintiff's husband, was the father of her third child. (*See* D.E. 19 at 5.) Plaintiff got along very well with Mr. Carey, (*see* D.E. 20 at Ex. A, 57, 115), but he would not tell Plaintiff who was making the statements. (*See id.* at 115.) No employees admitted making such statements. (*See* D.E. 19 at 5), and Plaintiff has not presented evidence that any employees made such comments to her. (*See* D.E. 20 at Ex. A, 57, 114-16.) Several employees,[2] including Plaintiff's supervisor at the time, Lori Karpiel (with whom Plaintiff got along well, (*see id.* at 57, 115)) stated upon seeing the child that it did not resemble Plaintiff's previous child that Plaintiff also had with her current husband.[3] Plaintiff did not

---

[2]Unless otherwise specified, the denomination "coworker" or "employee" means a nonsupervisor.

[3]Plaintiff's Local Rule 56.1(b)(3)(B) statement ("Plaintiff's Statement"), which cites to Plaintiff's deposition testimony as support, states that "several employees, upon seeing the child, stated he did not look like Plaintiff or her husband." (D.E. 19 at 6.) However, Plaintiff testified at her deposition that the other employees said "Oh, he doesn't look like Kevin. He doesn't look, you know, nothing like Kevin." (D.E. 20 at Ex. A, 57, 115.) Kevin is the name of the previous child Plaintiff had with her current husband, William. (*See id.* at 13, 34.)

complain to her employer about these circumstances.[4] (*See id.* at 116-17.)

In approximately August of 2001, Wrigley held a meeting of all the employees at its Chicago plant to discuss sexual harassment and the company's policy forbidding such harassment. This meeting appears to be part of an overall workplace sensitivity program at Wrigley and not directed to Plaintiff in particular. Plaintiff attended the meeting and signed a document verifying that she had done so. The meeting was conducted by Marilyn Turner of the Wrigley personnel department. Ms. Turner informed employees that Wrigley had a zero tolerance policy for sexual harassment and showed them a videotape that depicted examples of prohibited conduct. Plaintiff testified that Ms. Turner made it clear to employees that they should report any harassment to their supervisors. As a result of the meeting, Plaintiff understood that comments of a sexual nature are among the things prohibited by Wrigley's harassment policy.

In about December 2001, Plaintiff observed three gum trays that contained carvings of graphic sexual scenes in the sugar compounds that stick to the bottom of the trays. (*See* D.E. 20 at Ex. A, 74-78.) Another employee named Adam passed around the three trays on that day and he told Plaintiff that an employee in another department carved the images. (*See id.* at 77.) Plaintiff asked coworker Mike Lynch who was depicted in one of the carvings. He responded

---

[4]Plaintiff's Statement, which again cites to Plaintiff's deposition testimony as support, states that "Plaintiff complained only to her husband because one of the individuals who made such a statement was Lori Karpiel, a supervisory employee." (D.E. 19 at 6.) However, in regard to whether she complained to her employer, Plaintiff testified as follows:
"Q. Did you complain to anybody about those comments? A. No. I didn't. Just my husband." (D.E. 20 at Ex. A, 117.) Additionally, Plaintiff never testified that Ms. Karpiel said that Mr. Carey was the father of Plaintiff's child or that Ms. Karpiel was aware of such rumors. In fact, Plaintiff testified no supervisors were present when Plaintiff confronted her coemployees about the rumors. (*See id.* at 115-16.)

3

that it was her and then said, "Oh, no, it is not you. It doesn't have – it has big boobs." (*Id.* at

78.) Plaintiff did not report the episode; however, according to Plaintiff, when Wrigley

supervisors nonetheless became aware of the carvings, the matter was brought up in a

supervisors' meeting shortly after the incident. According to Plaintiff, at that meeting, the

manager of Wrigley's Chicago plant instructed the supervisors to put a stop to that kind of

activity. Plaintiff does not assert that any other carvings were made thereafter.

The following month, in January 2002, four of Plaintiff's male coworkers, Joe Gussich,

Dave Paskash, Lou Resendez, and Rudy Resendez, were "pitching money" in the aisle by the

machines in Plaintiff's department. After Rudy Resendez threw a dime near Plaintiff's machine,

Mr. Gussich said "'don't throw a dime; that's only worth a penny,'" and then Mr. Gussich threw

a penny near her. They saw that Plaintiff got upset, but "'they were just all laughing and joking

about it.'" (D.E. 19 at 2.) The money pitching stopped after Plaintiff turned around and went

back to her machine. Plaintiff did not mention this incident to a supervisor until approximately

five months later.

In April 2002, Plaintiff asked Mr. Paskash why he and Mr. Gussich, who normally got

along, seemed to be at odds. In response to Plaintiff's question, Mr. Paskash said that Mr.

Gussich told him that Mr. Gussich engaged in sex acts with a female employee in the elevator

during breaks and that when someone else confronted Mr. Gussich about what he was saying

about this female employee, Mr. Gussich figured that Mr. Paskash must have leaked the

information. (*See* D.E. 20 at Ex. A, 56.) If Plaintiff reported this incident to her employer, she

didn't do so until August 1, 2002, or some three to four months later. (*See id.*; *see also id.* at

137-38.)

4

Plaintiff was also occasionally exposed to a juvenile stunt of Mr. Gussich and Mr. Paskash (which stunt they did to various others, including both male and female employees, and each other) that involved them imitating a dog urinating. More specifically, on occasion, when Plaintiff would squat down to fix her machine, Mr. Gussich and Mr. Paskash, as if to imitate a dog urinating,[5] "would come over, raise one leg, pu[t] their crotch near [her] face and say tea time." (*Id.* at 109.) Mr. Gussich and Mr. Paskash did this to both male and female employees, and Plaintiff saw the two do this same thing to Plaintiff's former supervisor, Lori Karpiel. (*See id.*) According to Plaintiff, "[i]t was just a thing the guys would do all the time. They would even do it to each other." (*Id.*) Plaintiff did not complain to anyone about this behavior. (*See id.* at 110.)

In May 2002, certain comments were made to Plaintiff by Yaser Hassan, her supervisor's supervisor, about Plaintiff and Frank Molina, a mechanic assigned to maintain Plaintiff's machine. Plaintiff describes the first of such incidents as follows,

> Well, Yaser came by my machine when I had a day off and he said, "Oh, I thought you had a second job or something," and then he was saying, "pretty soon you will be calling Frank 'Uncle Frank'." And I asked him, "what does that mean?" and he just laughed and patted Frank Molina on the shoulder and walked away.

(D.E. 20 at Ex. A, 56.) A week or two later, after Plaintiff was asked to work overtime, Mr. Hassan said to Plaintiff: "You don't need to work overtime. I am sure you are making a lot of money on your second job." When Plaintiff asked what kind of job Mr. Hassan meant, he said "You know." After Plaintiff said she didn't know what he meant, Mr. Hassan either said "'Oh,

---

[5]In her response to Defendant's Statement, "Plaintiff denies the implication that Gussich and Paskash were trying to imitate a dog urinating." (D.E. 19 at 3.) However, Plaintiff testified as follows at her deposition, "Q.    Were they trying to look like a dog urinating? A.    Kind of in that position, yes." (D.E. 20 at Ex. A, 56.)

5

Uncle Frank will tell you' or just kind of laughed it off and walked away.'" (D.E. 20 at Ex. A,

92.) Plaintiff interpreted Mr. Hassan's comments as suggestions that she was a prostitute and

Frank Molina was her pimp because it is Plaintiff's understanding that "uncle" is a commonly

used term to describe a pimp or "sugar daddy."

Also in May 2002, Ashley Lynch, Plaintiff's coworker, and Ashley's father Mike Lynch,

also Plaintiff's coworker, sometimes would ask Plaintiff "How's business?" as they passed by

Plaintiff's machine. On one occasion, when Ashley and Mr. Lynch were talking by Plaintiff's

machine, Mr. Hassan came by and said, "Oh, get out of there. That's a bad influence over there."

(D.E. 20 at Ex. A, 92.) Mr. Hassan then said to Plaintiff "Oh, why do you want to be hanging

around with a college student? You will be teaching her bad habits." (D.E. 20 at Ex. A, 95.)[6]

Another of Plaintiff's coworkers, Martin (a/k/a "Marcel") Rachel, told Plaintiff in May

that Mr. Hassan and Plaintiff's supervisor, Brenda Stewart, told Mr. Rachel not to talk to

Plaintiff, that she would ruin his marriage. (*See* D.E. 19 at 6.) Plaintiff took this to mean that

Mr. Hassan and Ms. Stewart were suggesting to Mr. Rachel that Plaintiff would have an affair

with him. (*See id.*) Plaintiff asked Ms. Stewart whether she had made that statement. (*See* D.E.

20 at Ex. A, 117.) Ms. Stewart said "no, that Marcel must have t[aken] her comments the wrong

---

[6] As stated by Plaintiff, Ashley Lynch also "got a little comfortable in the way she would talk to me, or like she started punching me in the arm. She would just walk up and slug me real hard . . . and I asked her to stop because it hurt, and she said 'Come on. You can take it, bro.'" *Id.* at 43. After Plaintiff complained to her supervisor, Brenda Stewart, Ms. Stewart promptly transferred Ms. Lynch out of Plaintiff's department. Plaintiff does not contend that Ms. Stewart's punching her in the arm "serves as a basis for Plaintiff's sexual harassment claim." (D.E. 20 at 12.) At most (Plaintiff's brief is somewhat ambiguous on this score), Plaintiff contends that Ms. Lynch's punching her in the arm "is evidence of a pervasive mood at Wrigley that it was alright to taunt Plaintiff." (*Id.* At 13 n.2.) Plaintiff does not reconcile her position that Lynch's alleged punching of her prompted Lynch's transfer after Plaintiff complained with Plaintiff's assertion that Wrigley was signaling that it was acceptable to taunt Plaintiff.

way," and Ms. Stewart expressed her denial to Mr. Rachel. (*See id.* at 117-18.) Nonetheless, Ms. Stewart apologized to Plaintiff. (*See id.*)

At some point in 2002 prior to the third week of June, Grant Giessert, a male co-worker and mechanic, made offensive gestures and an improper comment to Plaintiff. On one day, Mr. Giessert held a grease gun and, as described by Plaintiff, "he had it by his groin and he pumped the grease out of it real slow and then he wiped it on my sweatshirt, and I told him he was nasty, and Marcel started laughing, and then I just like punched him and I walked away." (*Id.* at 100.) The following weekend, when Plaintiff and Mr. Giessert were working overtime, Plaintiff asked Mr. Giessert to get her sweatshirt from another department. When he returned, Mr. Giessert said "[o]h, sorry it took me so long. I had to stop off and take care of myself since you wouldn't." (*Id.* at 100-101.) Plaintiff became upset and scolded Mr. Giessert. He apologized.

After Plaintiff told a coworker about Mr. Giessert's comment, the coworker told Plaintiff "to go to personnel." (*Id.* at 101.) Plaintiff, however, did not report the conduct at that time because she "didn't want anybody to get fired." (*Id.*) Instead, Plaintiff talked to her friend, coworker Mr. Carey, about it and he "confronted Grant himself and told him, 'Do you know you can get fired for that?'" (*Id.* at 101.) According to Plaintiff, Mr. Giessert then "confronted me and said, 'Why are you telling everybody about it? I said I was sorry. I don't want to lose my job over this.' He asked me not to say anything and I agreed." (*Id.*)

Plaintiff asked supervisory employee Jim Browne why Mr. Hassan made the "second job" and "Uncle Frank" type of comments. (*See id.* at 93.) She asked him "did I do something to make Yaser think anything different about me; you know, sexually, did I do something to make him think that I had a side job as a hooker or anything." (*Id.*) Mr. Browne responded "Oh, no.

7

Yaser just jokes around a lot, you know. He is not mad at you or thinking anything different." (*Id.*) Plaintiff asked whether she should report Mr. Hassan's comments to her supervisor, Ms. Stewart. (*Id.*) Mr. Browne said "no, that there was nothing to worry about." (*Id.*)

Plaintiff did, however, report Mr. Hassan's comments to Ms. Stewart in the third week of June 2002. At that time, Plaintiff also reported to Ms. Stewart the "pitching money" incident involving Mr. Gussich and Mr. Paskash. Ms. Stewart explained that she had not heard of the "pitching money" incident but would look into it. Ms. Stewart also said that "she knows how Yaser is because she had to turn him in to personnel herself for harassment when she first became a supervisor." (*Id.* at 98.) Ms. Stewart did not further explain the nature of the previous report about Mr. Hassan that she mentioned. Plaintiff "had known from being in the office that [Mr. Hassan] was picking on [Ms. Stewart] quite often. She [Ms. Stewart] was reporting him to Rich Kane, and several times Rich Kane came down and got Yaser and went to talk to him." (*Id.*) Ms. Stewart told Plaintiff that Ms. Stewart would talk to Rich Kane, who was Mr. Hassan's supervisor and in charge of all production at the plant, about Mr. Hassan.

The next day, however, Plaintiff felt that Mr. Hassan was giving her "dirty looks" when he walked by, so Plaintiff went back to Ms. Stewart and said that if Mr. Hassan was going to treat her "nasty" because she reported his comments, then Plaintiff would go to personnel. At that point, Ms. Stewart called Mr. Kane, who came to the department to talk to Plaintiff that same day. (*See id.* at 102.)

Plaintiff told Mr. Kane about Mr. Hassan's comments, the "pitching money" incident, and, with regard to Mr. Giessert, as Plaintiff testified at her deposition, "I told [Mr. Kane] that [Mr. Giessert] was making sexual comments. I didn't explain exactly what they were because I

8

didn't want him to lose his job." (*Id.* at 104.) Plaintiff was then asked, "So you told Rich that Grant had been making sexual comments without giving the details?" and Plaintiff responded, "Um-hmm." *Id.* Mr. Kane spoke with Mr. Hassan about Mr. Hassan's comments to Plaintiff. Mr. Hassan then called Plaintiff into his office and apologized, explaining that he did not mean for his remarks to be taken as Plaintiff had interpreted them.

The following day, Mr. Kane held a meeting with all the male employees of the department and reminded them of Wrigley's sexual harassment policy. In that meeting, according to Plaintiff, Mr. Kane told the employees that a harassment complaint had been made and that such things would not be taken lightly by the company. Mr. Kane also instructed the attendees that Wrigley expected all of its employees to adhere to Wrigley's policy against sexual harassment, and that the men should treat their female coworkers like they would treat their mothers. Plaintiff does not allege that she was subjected to any sexually harassing or sexually offensive conduct after she spoke to Ms. Stewart and Mr. Kane.[7]

On August 1, 2002, Plaintiff alleges that she was involved in an incident with Mr. Browne and Mr. Hassan that was upsetting but did not involve sexual references or sexual harassment. (D.E. 19 at 12.)[8] More specifically, Plaintiff testified that when Mr. Hassan and Mr. Browne walked up to Plaintiff as she was standing by her machine, Plaintiff reported to Mr. Hassan that someone from the previous shift had inappropriately left paper refuse in some of the

---

[7] The record is unclear as to whether Mr. Kane met with the male employees during the third week of June or the last week of July 2002. (*Compare* D.E. 20 at Ex. A, 105 *with id.* at 64.)

[8] Plaintiff contends that this incident, like the Ashley Lynch incident (*see* Note 6, *supra*) was evidence of a pervasive mood at Wrigley that it was "alright to taunt Plaintiff." (D.E. 19 at 13 n.2.)

gum boxes. (Leaving such refuse in the gum boxes is against Wrigley policy because the paper could get in with the gum product and contaminate a shipment.) Mr. Hassan responded, "Yes, we need to get some younger workers in here," and Mr. Browne then said "Yes, some young whackers, get it, whack hers." Mr. Hassan told Mr. Browne to shut up, and both left the area.

Plaintiff was upset by Mr. Brown's "whack hers" comment, but she did not feel it was a sexual reference. The comment upset Plaintiff because she "took it that they were making fun of the idea that I had reported Ashley Lynch for hitting me, like making it like it was just this light situation." (*Id.* at 60.) Minutes later, Mr. Kane came by Plaintiff's machine, saw that Plaintiff seemed upset, and asked her what was wrong. Plaintiff told Mr. Kane of her encounter that morning with Mr. Hassan and Mr. Browne, and indicated that she felt it showed that Mr. Kane's earlier meeting with the male employees had not been effective. Mr. Kane said that he would speak with Mr. Hassan and Mr. Browne.

Plaintiff then met with Ms. Turner in personnel. Plaintiff told Ms. Turner as much as she could remember about the various incidents described above. Plaintiff talked with Ms Turner for twenty to twenty-five minutes. Because Plaintiff was upset, Ms. Turner requested and obtained permission to call and ask Plaintiff's mother to attend the meeting. Consequently, Plaintiff's mother was present for part of the meeting. (*See id.* at 139.) At the end of the meeting, Ms. Turner and Plaintiff agreed that it would be best for Plaintiff to go home while the personnel department started an investigation of Plaintiff's allegations.

Plaintiff drove herself home when she left Wrigley. Later that day she felt suicidal and drove herself to a hospital where she was admitted to the psychiatric ward and stayed for five days. (*See* D.E. 19 at 7.) After Plaintiff left the hospital, representatives of Wrigley's personnel

department telephoned Plaintiff and told her that they had finished investigating her allegations and had interviewed the individuals involved. The personnel department representatives told Plaintiff that her allegations were not corroborated,[9] and that some of the other employees gave different versions of some of the events she alleged. The representatives discussed with Plaintiff the option of moving her to another department, but Plaintiff was not interested in such a move because she felt she would become the subject of gossip. (*See* D.E. 20 at Ex. A, 198-99.) Plaintiff testified that the representatives "were very nice to me," even if she was not pleased with the outcome of their investigations.

Plaintiff testified that Martin Rachel told her that neither he nor Tom Carey were interviewed during Wrigley's investigation. (*See* D.E. 20 at Ex. A, 171.) Plaintiff also testified that she got an undefined "report" that Terri Nicholls was not interviewed. (*See id.*) Plaintiff believes Ms. Nicholls should have been interviewed because "there has been things that she has told me that the guys have said to her, so I just thought that they should have called her in also." (*Id.*) Plaintiff further testified that her husband was told that, sometime during the year or so after Plaintiff's last day at work, Mr. Hassan made "negative comments" about two female employees to a mechanic and that Mr. Gussich "put a nasty note" on a female employee's posterior about ten months after Plaintiff went on disability leave. (*Id.* at 160-61.)

Plaintiff has been "depressed, anxious, and is not functioning well," and she has not returned to work since August 1, 2002. *Id.* Plaintiff believes her condition was prompted by her

---

[9]"Plaintiff denies the allegation that the [personnel department] representatives told Plaintiff that her allegations were not corroborated." (D.E. 19 at 4.) However, Plaintiff does not cite any evidentiary support for her denial. Moreover, Plaintiff testified that the personnel department representatives "told me that my reports were unfounded." (D.E. 20 at Ex. A, 167.)

experiences at Wrigley. Since August 1, 2002, Plaintiff has been on a disability leave of absence, during which time she has been receiving short-term wage loss benefits under Wrigley's disability benefits plan.[10]

## DISCUSSION

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether there is a genuine issue of fact, the court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004).[11] To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

To survive a summary judgment motion, an employee alleging a gender-based hostile work environment must show: "(1) she was subjected to unwelcome sexual harassment; (2) the harassment was based on sex; (3) 'the harassment had the effect of unreasonably interfering with the plaintiff's work performance in creating an intimidating, hostile or offensive working environment that affected seriously the psychological well-being of the plaintiff'; and; (4) there is

---

[10]Defendant's insurance carrier called Plaintiff in October 2002 and told her that they were going to discontinue coverage, but there is no dispute that Plaintiff has continued receiving coverage.

[11]For purposes of this summary judgment opinion, the Court treats all of Plaintiff's allegations as true, resolves all conflicts in testimony in Plaintiff's favor, and draws all reasonable inferences in Plaintiff's favor.

a basis for employer liability." *Robinson v. Sappington*, 351 F.3d 317, 328-29 (7th Cir. 2004) (quoting *Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1032 (7th Cir. 1998), and citing *Hall v. Bodine Elec. Co.*, 276 F.3d 345, 355 (7th Cir. 2002)). "The third prong of the prima facie case requires both a subjective and objective inquiry, compelling the court to ask whether a reasonable person would find the environment hostile." *Robinson*, 351 F.3d at 329.

As explained below, certain of the incidents of which Plaintiff complains are not actionable because Plaintiff has not raised a genuine issue of fact as to whether they were based on Plaintiff's gender, and one incident is time-barred. Furthermore, under applicable precedent, Defendant cannot be held responsible for the alleged harassment of non-supervisory employees because Defendant took reasonable steps to remedy any such harassment (again, assuming the allegations are true, as the Court must) once Defendant was on notice. As for the incidents of gender-based harassment for which Defendant's supervisors are responsible, these were not sufficiently severe or pervasive, under applicable precedent, to create a hostile or abusive situation from an objective standpoint. Accordingly, Defendant is entitled to summary judgment.

A.      Harassment Not Based on Gender

"[I]n the context of a sexual discrimination charge based on a hostile work environment, '[t]he critical issue . . . is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.'" *Berry v. Delta Airlines, Inc.*, 260 F.3d 803, 808 (7th Cir. 2001) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)). "[A]n employer cannot be held liable for creating or condoning a hostile working environment unless the hostility is motivated by gender." *Id.* at 808.

Plaintiff concedes that the incidents involving Ms. Lynch punching Plaintiff in the arm

13

and Mr. Browne's "whack hers" comment, which were not motivated by gender, cannot form the basis of her suit. *See* (D.E. 20 at 12). Plaintiff argues, however, that the conduct of Mr. Gussich and Mr. Paskash raising one leg and "putting their crotch near [Plaintiff's] face" and saying "tea time" when she squatted down to fix her machine is actionable as sexual harassment even though it is undisputed that Mr. Gussich and Mr. Paskash did this to both male and female employees and "They would even do it to each other." (D.E. 20 at Ex. A, 109.)

The Court respectfully disagrees. The Seventh Circuit has taught that "inappropriate conduct that is inflicted on both sexes, or is inflicted regardless of sex, is outside the statute's ambit." *See Holdman v. State of Indiana*, 211 F.3d 399, 403 (7th Cir. 2000) (dismissing claims of husband and wife who alleged that their supervisor sexually harassed both of them by requesting sexual favors). Put another way, precedent teaches that the key question is not how Plaintiff perceived the conduct as compared with male employees who were subject to the same harassment, but rather whether the harasser's behavior "is motivated by gender." *Berry*, 260 F.3d at 808 (finding incidents "are not actionable as sexual harassment under Title VII (either collectively or individually) because Berry has presented no evidence suggesting that any of these incidents were motivated by her gender"); *see also Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 976 (7th Cir. 2004) (stating that plaintiff could not "base a hostile environment claim upon [employees'] vulgar language because, at most, they are crude individuals who treated everyone poorly"); *Holdman*, 211 F.3d at 403 ("Title VII does not cover the 'equal opportunity' . . . harasser, then, because such a person is not *discriminating* on the basis of sex.") (emphasis in original). Therefore, because Plaintiff has not presented any evidence that Mr. Gussich's and Mr. Paskach's juvenile "tea time" actions, which they did to male and female employees alike, and

even to each other, were motivated by Plaintiff's gender, liability cannot be imposed under Title VII for this conduct.[12]

### B. Time-Barred Incident

Plaintiff admits that the circumstances surrounding her return to work in about August of 2000 from maternity leave for the birth of her youngest child (when she heard that there were rumors that the child was her coworker's rather than her husband's), cannot serve as the basis of her complaint.[13] These events took place more than 300 days before she filed her EEOC complaint, 300 days being the relevant Title VII limitations period. *See* 42 U.S.C. § 2000e-5(e)(1)). In addition, the sixteen-month gap between the August 2000 incident and the next episode of harassment would likely preclude Plaintiff from drawing the earlier incident in for liability purposes under a continuing violation theory. S*ee Garrison v. Burke*, 165 F.3d 565, 570-71 (7th Cir. 1999) (act of harassment outside of limitations period could not be linked with acts within limitations period where there was a two-year gap between them); *see also Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 766 (2d Cir. 1998) (finding that one-year gap between incidents "br[oke] the asserted continuum of discrimination"). In any event, Plaintiff has not argued or alleged a continuing violation theory.

---

[12]Plaintiff has not suggested, and there is no evidence, that Mr. Gussich and Mr. Paskash engaged in their immature "tea time" conduct with respect to other male employees, including each other, so that they could avoid liability for harassing females in this way. *See Holdman*, 211 F.3d at 404 ("[I]f attorneys were actually to dispense such incredible advice [to harass members of both sexes in order to disguise their real intent], and their clients were to follow it, the clients would still be subject to Title VII liability.").

[13]*See* (D.E. 20 at 9) ("Plaintiff first felt the sting of sexual harassment in 2000 when she returned from maternity leave . . . . However, the harassment which is the subject of this complaint did not commence until December 2001.").

While recognizing that the August 2000 rumor incident is "outside the time frame of Plaintiff's EEOC complaint" and cannot form the basis of her complaint, Plaintiff contends that her testimony about this episode "is relevant to the existence of a hostile environment in the workplace." (D.E. 20 at 14 n.3.) It is true, as Plaintiff suggests, that harassment which occurs outside the limitations period may be relevant to whether incidents within the period were driven by a discriminatory motive. *See Shanoff v. Ill. Dep't of Human Servs.*, 258 F.3d 696, 705 (7th Cir. 2001) (stating that time-barred conduct may be considered "to illuminate the nature of the hostility involved in the actionable conduct") (citing *Cortes v. Maxus Exploration Co.*, 977 F.2d 195, 199-200 (5th Cir. 1992) (finding that time-barred conduct could be used to illuminate discriminatory motives behind current practices)).

Thus, in circumstances where a Plaintiff has clear evidence of a substantial pattern of discrimination that cannot form the basis of a suit because it is time-barred, such evidence has been considered relevant to the discriminatory nature of practices occurring within the limitations period. *See Shanoff*, 258 F.3d at 705 (finding it proper to consider evidence of time-barred harassment that plaintiff's supervisor, among other things, called plaintiff a "haughty Jew," then lunged at him with a pen, told plaintiff that she knew how to handle white Jewish males like him, and denied him leave for Yom Kippur by stating "I don't give a damn about your holidays"); *see also Cortes*, 977 F.2d at 199-200 (finding it proper to consider time-barred evidence that plaintiff's supervisor, among other things, "repeatedly asked [plaintiff] to have sexual relations with him, sometimes threatening to demote or fire her if she refused . . . made lewd remarks about her body, told her vulgar jokes on a daily basis, showed her pornographic photographs . . . and frequently brushed up against her legs and breasts"). However, the August 2000 incident

involving the rumor that Plaintiff's coworker is the father of her child hardly constitutes the kind of clear evidence of a substantial pattern of discrimination that was found in *Shanoff* and *Cortes*. Indeed, in a case where the plaintiff alleged that rumors that he was having an affair with a coworker constituted sexual harassment, the Seventh Circuit affirmed summary judgment for the defendant on grounds that the harassment was not gender-based. *See Pasqua v. Metro. Life Ins. Co.*, 101 F.3d 514, 517 (7th Cir. 1996) ("Such rumors spread, irrespective of the truth, for any number of reasons having nothing to do with gender discrimination.").

Therefore, it is questionable whether the August 2000 episode is even relevant to the issue of discriminatory motive in this case. Moreover, any relevance the August 2000 events might otherwise have is largely mooted by the fact that, other than the conduct towards Plaintiff which she has conceded was not based on gender, the "tea time" incidents which were imposed on male and female employees alike, and Plaintiff's testimony that she knew Mr. Hassan "was picking on" Ms. Stewart,[14] the Court will assume for purposes of considering Defendant's motion that *all* of the incidents of harassment were gender-based.

C.    Employer Liability

The issue of which incidents may be attributed to a defendant for purposes of liability may properly be decided before the hostile working environment analysis. *See Wyninger v. New*

---

[14]The August 2000 episode cannot illuminate the question of whether Mr. Hassan sexually harassed Ms. Stewart since neither Mr. Hassan nor Ms. Stewart were alleged to be involved in that incident. Moreover, as it regards Defendant's motion for summary judgment on Plaintiff's sexual harassment claim, even if it could be established that Mr. Hassan sexually harassed Ms. Stewart, that harassment would be relevant only insofar as Plaintiff's knowledge of such harassment of Ms. Stewart was itself was a form of second-hand sexual harassment on Plaintiff. Thus, to establish that these incidents constituted second hand harassment, Plaintiff would need to present evidence that she knew they were gender-based. Plaintiff has provided no such evidence.

17

*Venture Gear, Inc.*, 361 F.3d 965, 977 (7th Cir. 2004) ("We need not decide whether Slaven's behavior constitutes an objectively abusive working environment, however, because 'the question whether [defendant] took prompt and effective remedial action is dispositive here.'") (quoting *Tutman v. WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1048-49 (7th Cir. 2000)); *see also Quinn*, 159 F.3d at 768 n.8 ("Although in this case, we first decide which alleged incidents can be attributed to the defendant and only then consider whether this conduct rises to the level of actionable Title VII harassment, we do not mean to suggest that these steps of the inquiry must proceed in this order.").

Where, as here, harassment by both supervisors and coworkers is at issue, it may be preferable to decide the liability issue first because "[a]n employer's liability for hostile environment sexual harassment hinges on whether the harasser is the victim's supervisor or merely a co-employee." *Hall v. Bodine Elec. Co.*, 276 F.3d 345, 355 (7th Cir. 2002) (citing *Parkins*, 163 F.3d at 1032. "'An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee.'" *Parkins*, 163 F.3d at 1032 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 745 (1998)). On the other hand, "employers are liable for a co-employee's harassment only when they have been negligent either in discovering or remedying the harassment." *Id.* (internal quotation omitted).

Thus, if it becomes clear that the actions of either supervisors or coworkers cannot form the basis of liability, while the actions of the other group can, the analysis of whether a hostile work environment was created can be appropriately focused. *See Mason v. S. Ill. Univ. at Carbondale*, 233 F.3d 1036, 1045 (7th Cir. 2000) (affirming district court's decision to exclude

evidence of harassing comments by coworkers not made in supervisor's presence where the plaintiff could base its claim only on the supervisor's conduct); *Quinn*, 159 F.3d at 766-67 (holding that the district court properly declined to consider allegations regarding the conduct of defendant's coworkers in determining whether hostile work environment existed where harassment by both supervisors and coworkers was alleged but liability could not be imposed for coworker conduct).[15]

This is such a case. Because precedent teaches that Defendant cannot be held to violate Title VII for the alleged actions of its employees under the circumstances of this case, the Court's hostile work-environment analysis will be focused on the conduct of Plaintiff's supervisors. Defendant is not liable for the actions of its employees because it took reasonable steps to discover and correct the acts of sexual harassment by its employees. *See Hall*, 276 F.3d at 355 ("An employer's legal duty in co-employee harassment cases 'will be discharged if it takes 'reasonable steps to discover and rectify acts of sexual harassment by its employees.'") (quoting *Parkins*, 163 F.3d at 1032). "Title VII neither requires nor expects the management of a company to be aware of every impropriety committed by every low-level employee. Therefore, notice or knowledge of the harassment is a prerequisite for liability in coemployee harassment cases." *Id.* at 356 (internal quotation and citation omitted). "In determining whether an employer had notice of harassment, we first determine whether the employer has designated a channel for complaints of harassment." *Parkins*, 163 F.3d at 1035.

---

[15]Of course, if there is a basis for liability for the conduct of both supervisors and coworkers, then all of the incidents involving both groups should be considered in determining whether a hostile work environment was created. *See Mason*, 233 F.3d at 1044-45 (citing *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 559, 562-63 & n.4 (6th Cir. 1999)).

It is undisputed that in approximately August of 2001, Defendant held a meeting of all the employees at its Chicago plant, including Plaintiff, and that Ms. Turner, the person running the meeting, made it clear to employees that they should report any harassment to their supervisors. Also evident from the record is that Plaintiff understood that this avenue was open to her. Indeed, the expressed basis for her delay in reporting the conduct of her coworkers—that she "didn't want anybody to get fired"--demonstrates that she believed that Wrigley would treat her complaints seriously and that the channel would be effective. Not having taken advantage of the available reporting mechanism until June of 2002, Plaintiff is ill-positioned to assert that Defendant was derelict in not having notice before that time. *See Hall*, 276 F.3d at 356-57 (holding that defendant could not be held liable for harassment that occurred before June of 1999 when the plaintiff could have reported the harassment to a supervisor but did not do so until that time); *accord Parkins*, 163 F.3d at 1038 (similar). Moreover, the reasonableness of Defendant's efforts to discover sexual harassment is further evidenced by the fact that it discovered (and instructed its supervisors to put a stop to) the gum tray carvings even though Plaintiff never reported them.

Nor can Plaintiff successfully claim that Defendant's responses to her complaints were unreasonable.

> If an employer takes reasonable steps to discover and rectify the harassment of its employees . . . it has discharged its legal duty . . . We are not to focus solely upon whether the remedial activity ultimately succeeded, but instead should determine whether the employer's total response was reasonable under the circumstances as then existed. The reasonableness of an employer's response depends, in part, on the gravity of the harassment alleged.

*Berry v. Delta Airlines, Inc.*, 260 F.3d 803, 811 (7th Cir. 2001). The Seventh Circuit's recent

opinion in *Cooper-Schut v. Visteon Automotive Systems*, 361 F.3d 421 (7th Cir. 2004) is instructive regarding what constitutes reasonable steps to rectify harassment. In that case, the plaintiff alleged "serious and disturbing" incidents of racial and sexual harassment, including that she was taken to the hospital to receive medical attention for an injury from a tray thrown at her from above, had another tray thrown at her days later, and that she feared for her personal safety. *See Cooper-Schut*, 361 F.3d at 425-26. The defendant investigated the incidents, conducted interviews, met individually with alleged harassers, and "[i]nstead of disciplining employees, it reviewed its zero tolerance policy concerning racial and sexual harassment with all employees at the plant." *Id.* at 427-28. The Court affirmed the district court's grant of summary judgment in favor of the defendant, stating that the defendant "took reasonable actions to remedy the violations." *Id.* at 428.

In this case, which does not involve any allegations that Plaintiff's safety was compromised, Defendant took similar remedial measures to those in *Cooper-Schut*. Defendant conducted an investigation, met with all the male employees of Plaintiff's department, reminding them of Defendant's policy against sexual harassment, and met individually with Mr. Hassan, prompting him to apologize to Plaintiff. (Precedent teaches that requiring such apologies militates against a finding that a workplace is a hostile one. *See, e.g., Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 978 (7th Cir. 2004); *Tutman*, 209 F.3d at 1049.) In addition, Ms. Lynch was transferred to another department (when Plaintiff reported Lynch's punching her), Ms. Stewart apologized to Plaintiff, and the option of transferring Plaintiff to another department was discussed with her. In addition, Defendant, as mentioned above, promptly instructed its supervisors to put a stop to the gum tray carvings, having learned about and responded to the

incident even in the absence of any complaint.

The reasoning of another recent Seventh Circuit opinion, *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965 (7th Cir. 2004), confirms the conclusion that Defendant's responses were reasonable. In response to Plaintiff's complaint that she received harassing phone calls and was subjected to an "intimidating meeting," the defendant investigated the incidents but did not discipline any employees. *See id.* at 977-78. In holding that the defendant's response was reasonable, the Court noted that "[o]ur determination in this regard could have been made easier had [defendant] reminded its employees of the company's written sexual harassment policy, offered [defendant] an alternative to dealing directly with [the harasser], and ordered the men to offer an apology to [plaintiff] for causing her grief." *Id.* at 978. In this case, Defendant effectively did all of the things *Wyninger* recommended.

Plaintiff's contention that "the record does not clearly establish that the harassment was remedied," (*see* D.E. 20 at 22-23), is unavailing. As mentioned above, the Seventh Circuit has directed that "'[w]e are not to focus solely upon whether the remedial activity ultimately succeeded, but instead should determine whether the employer's total response was reasonable under the circumstances as then existed.'" *Berry*, 260 F.3d at 811 (quoting *McKenzie v. Ill. Dep't of Transp.*, 92 F.3d 473, 480 (7th Cir. 1996)). As discussed, Defendant has met this standard. Moreover, Plaintiff has not presented any competent evidence that Defendant's remedial measures were not effective. Plaintiff's only support for her contention is her testimony that her husband was told that Mr. Hassan, sometime during the year or so after Plaintiff stopped working, made "negative comments" to a mechanic about two female employees and that Mr. Gussich "put a nasty note" on a female employee's posterior about ten months after Plaintiff

went on disability leave. The Court must disregard such hearsay. *See Minor v. Ivy Tech State College*, 174 F.3d 855, 857 (7th Cir. 1999) ("Courts must be particularly assiduous to enforce the hearsay rule in sexual harassment cases . . . .").

The Court also respectfully rejects Plaintiff's contention that Defendant's responses were unreasonable because the department-wide meeting following her complaint to Mr. Kane was held with only male employees and three employees were not interviewed as part of Defendant's investigation. The Court notes that Ms. Stewart, the only female employee in Plaintiff's department at the time of the meeting who allegedly sexually harassed Plaintiff, denied making the comment attributed to her and nonetheless apologized to Plaintiff. As for the three employees who were allegedly not interviewed, Mr. Carey, Mr. Rachel, and Ms. Nicholls, none were alleged to be harassers. More to the point, the Court does not "'sit as a super-personnel department.'" *Wyninger*, 361 F.3d at 978 (quoting *Ransom v. CSC Consulting, Inc.*, 217 F.3d 467, 471 (7th Cir. 2000)). In sum, because it was not negligent in discovering or responding to the harassment, Defendant cannot be held liable for the acts of its nonsupervisory employees. Accordingly, for its analysis of whether Plaintiff was subjected to a hostile work environment, the Court turns to the conduct of Plaintiff's supervisors.

D.   Hostile Work Environment

The parties do not dispute that Plaintiff subjectively felt that her work environment was hostile. However, as noted above, Plaintiff must also meet the objective test. "The harassment must be sufficiently severe that a rational trier of fact could find that it actually changed the conditions of the plaintiff's workplace." *Pryor v. Seyfarth, Shaw, Fairweather & Geraldson*, 212 F.3d 976, 978 (7th Cir. 2000). This inquiry requires consideration of "the totality of the

23

circumstances, including but not limited to the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Murray v. Chicago Transit Auth.*, 252 F.3d 880, 889 (7th Cir. 2001) (internal quotations omitted).

After setting aside the nonactionable incidents discussed above, the only remaining conduct at issue is (1) the alleged comment to Mr. Rachel by Ms. Stewart and Mr. Hassan (as reported to Plaintiff by Mr. Rachel in May) that Mr. Rachel should not talk to Plaintiff, that she would ruin his marriage,[16] (2) two occasions in May on which Mr. Hassan referred to Plaintiff's "second job" and suggested that she should call Frank Molina, her mechanic, "Uncle Frank," and (3) one incident in May when Mr. Hassan told Plaintiff that she would teach Ms. Lynch bad habits. Under Seventh Circuit precedent, such conduct does not constitute an actionable hostile work environment.[17]

The facts of *Rogers v. City of Chicago*, 320 F.3d 748 (7th Cir. 2003), are instructive in that regard. In that case, the Seventh Circuit affirmed a grant of summary judgment for the defendant, notwithstanding that plaintiff, a female police officer, alleged that a sergeant told her "[y]our breasts looks nice in that turtleneck, that red turtleneck"; ordered her to walk a document across the room "so I can watch you walk over and put it in"; caught ahold of the plaintiff when

---

[16]Precedent teaches that "the impact of such 'second hand' harassment is obviously not as great as harassment directed toward [Plaintiff] herself." *Patt v. Family Health Systs., Inc.*, 280 F.3d 749, 754 (7th Cir. 2002); *accord, e.g., Russell v. Bd. Of Trustees of Univ. of Illinois-Chicago*, 243 F.3d 336, 343 (7th Cir. 2001).

[17]This conclusion would not change if the incidents involving Plaintiff's coworkers Ashley and Mr. Lynch asking her "How's business" are considered part of the hostile working environment analysis under the theory that Mr. Hassan directed them to make these comments (evidence of which has not been presented).

24

she appeared to fall and asked her "whether she had a boyfriend or needed one"; and told the officer that he would "like to be that FOP [Fraternal Order of Police book] in [her] back pocket." *Rogers*, 320 F.3d at 750. *Rogers* affirmed the grant of summary judgment for the City on the hostile workplace claim, concluding that plaintiff could "prove little more than that she encountered a number of offensive comments over a period of several months." *Id.* at 752-53. *Accord, e.g, Patt*, 280 F.3d at 754 (affirming summary judgment for defendant where male chief surgeon made several offensive comments either to Plaintiff, a junior surgeon, or within her hearing, including "the only valuable thing to a woman is that she has breasts and a vagina"); *Adusumilli v. City of Chicago*, 164 F.3d 353, 357, 361-62 (7th Cir. 1998) (affirming summary judgment for defendant where coworkers engaged in a variety of conduct including telling plaintiff that "she should not wave at squad cars in front of the police station because people would think she was a prostitute," "ambiguous comments about bananas, rubber bands, and low-neck tops, staring and attempts to make eye contact, and four isolated incidents in which a co-worker briefly touched her arm, fingers, or buttocks."); *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430-31 (7th Cir. 1995) (holding that plaintiff could not establish an objectively hostile work environment where the plaintiff's supervisor, over a seven-month period, called her a "pretty girl," grunted "um um um" when plaintiff wore a leather skirt to the office, told plaintiff that her presence made the office "hot," suggested that all "pretty girls," presumably including plaintiff, "run around naked," told the plaintiff that he left the Christmas party early because he "didn't want to lose control" at the sight of "so many pretty girls," and suggested to the plaintiff that masturbation was his chief consolation in his wife's absence); *Weiss v. Coca-Cola Bottling Co. of Chicago*, 990 F.2d 333, 337 (7th Cir. 1993) (affirming summary judgment for defendant

where plaintiff's supervisor "called her a 'dumb blond,' put his hand on her shoulder several times, placed 'I love you' signs in her work area"; and repeatedly tried to kiss plaintiff); *Saxton v. Am. Tel. and Tel. Co.*, 10 F.3d 526, 528 (7th Cir. 1993) (affirming summary judgment for defendant where plaintiff's supervisor placed his hand on her knee several times, rubbed his hand along her upper thigh, pulled her into a doorway and kissed her, and lurched at her from behind some bushes as if to grab her).

The following statement by the Court in *Baskerville* could also be said of Mr. Hassan: "[h]e never touched the plaintiff. He did not invite her, explicitly or by implication, to have sex with him, or to go out on a date with him. He made no threats. He did not expose himself, or show her dirty pictures. He never said anything to her that could not be repeated on primetime television." *Baskerville*, 50 F.3d at 431. Hence, under *Baskerville*, *Rogers*, and related authority, Plaintiff cannot establish an objectively hostile work environment.

CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is granted.

Mark Filip
United States District Judge
Northern District of Illinois

Enter: **MAY 6 2004**

26